# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| MARY ALEXANDRE, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| NATIONAL UNION FIRE INSURANCE | ) |
| COMPANY OF PITTSBURGH, PA., | ) |
| | ) |
| **Defendant.** | ) |

**Civil Action No.
20-10636-FDS**

_____

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This action arises under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 ("ERISA").  Plaintiff Mary Alexandre contends that defendant National Union Fire Insurance Company of Pittsburgh, Pa., wrongfully denied her claim for accidental death benefits following her husband's death.  The claim was denied on the ground that her husband committed suicide. Plaintiff now seeks a judgment against National Union requiring it to pay $500,000 in benefits.

The parties have cross-moved for summary judgment.  For the following reasons, plaintiff's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

## I.    Background

### A.    Factual Background

#### 1.    The Accidental Death and Dismemberment Insurance Plan

In May 2018, Mary Alexandre worked at PricewaterhouseCoopers LLP ("PwC").  (Pl.

SMF ¶ 1).[1]  PwC sponsored an accidental death and dismemberment ("AD&D") insurance plan

on behalf of its eligible employees.  (Def. SMF ¶ 1).  That plan was "designed to pay benefits for

death or dismemberment resulting from an accident."  (Def. SMF Ex. 1, at 8).

PwC assigned fiduciary responsibility for claim determination to National Union Fire

Insurance Company of Pittsburgh, Pa.  (Def. SMF Ex. 1, at 17).  Under the terms of the plan,

National Union has "the right to interpret the provisions of [the plan], and its decisions are

conclusive and binding."  (*Id.*).

National Union also insures the benefits under the plan pursuant to a group accident

insurance policy.  (*Id.* at 22; Def. SMF Ex. 2).  That policy provides that National Union will pay

accidental death benefits "[i]f Injury to the Insured Person results in death within 365 days of the

date of the accident that caused the Injury."  (Def. SMF Ex. 2, at 4).  It defines "Injury" as

"bodily injury . . . which is sustained as a direct result of an unintended, unanticipated accident

that is external to the body . . . ."  (*Id.* at 34).  And it excludes from coverage "any loss resulting

in whole or in part from . . . suicide or any attempt at suicide or intentionally self-inflicted Injury

or any attempt at intentionally self-inflicted Injury."  (*Id.*).

Alexandre was enrolled in the plan.  (Pl. SMF ¶ 1; Def. SMF ¶ 2).  Her husband, Marzuq

Muhammad, was an insured, and she was his beneficiary.  (*Id.*).

### 2.    **Marzuq Muhammad's Death**

On May 18, 2018, Marzuq and his brother, Mujihad Muhammad, traveled from Boston to

---

[1]  ERISA benefit-denial cases are typically adjudicated on the record before the plan administrator.  *See Denmark v. Liberty Life Assurance Co.*, 566 F.3d 1, 10 (1st Cir. 2009).  Here, neither party has submitted the administrative record.  The parties have submitted statements of material facts.  The complaint includes several exhibits, which National Union has re-submitted as exhibits to its statement of material facts, that appear to be part of the administrative record.  Neither party has moved to strike or otherwise objected to the exhibits.  As a result, the facts are based on the exhibits and the undisputed facts in the statements of material facts.

Atlanta for an event.  (Def. SMF ¶ 7; Def. SMF Ex. 3, at 2).[2]  They stayed overnight at the Hyatt

Regency Hotel.  (*Id.*).

According to the Fulton County Medical Examiner's Investigative Summary, early in the

morning on May 20, Mujihad was asleep in his room on the tenth floor of the hotel.  (Def. SMF

Ex. 3, at 2).  Marzuq sat on the side of his bed, squeezed his hand, and stood up.  (*Id.*).  Mujihad

awoke and saw Marzuq "in a full sprint" out the door.  (*Id.*).  Mujihad then heard a loud noise,

and after he went outside, he saw Marzuq in a flower arrangement on the ledge one floor below.

(*Id.*).  Mujihad saw his brother "kicking and wiggling" in the flower arrangement and yelled,

"[N]o, no, keep still."  (*Id.*).  A witness to the incident who was in the atrium stated that Mujihad

yelled, "[N]o, no, keep still, don't do it."  (*Id.*).  Marzuq then rolled off the ledge and fell nine

floors to the atrium.  (*Id.*).  He was pronounced dead at the scene.  (*Id.*).  The Georgia

Department of Public Health declared his death to be a suicide.  (Def. SMF Ex. 5, at 1).

In support of Alexandre's appeal of the denial of her benefits, Mujihad submitted a

declaration describing the incident.  (Def. SMF Ex. 4).  That description is different in certain

respects from the description he provided the police and the Fulton County medical examiner the

night of the incident.  Most significantly, Mujihad attests that Marzuq "stood up [from the bed]

and went out the door" and "did not appear to be disturbed or alarmed."  (*Id.* ¶ 3).  Because

Mujihad saw no cause for concern, he "rolled over to go back to sleep."  (*Id.*).  After he heard a

noise outside of the room, he went to the balcony and saw Marzuq "on the other side of the

railing, in an awkward upside-down position and stuck in the planter/trellis."  (*Id.*).  Marzuq was

"writhing or wiggling, trying to free himself."  (*Id.*).  Mujihad then "yelled to him, urging him to

---

[2] Because Marzuq and his brother share the same last name, this memorandum will refer to them by their first names to avoid any confusion.

stay while [Mujihad] figured out how to retrieve him."  (*Id.*).  However, Marzuq "continued to writhe or wiggle and then fell to the ninth floor balcony of the Hotel, from which he rolled off and fell to the first floor to his death."  (*Id.*).

Mujihad stated to the Fulton County medical examiner that, leading up to the incident, Marzuq's behavior was "normal" and "he did not voice or show any signs of mental problems." (Def. SMF Ex. 3, at 2).  He also stated that Marzuq "never talked about or attempted suicide." (*Id.*).  He attests to the same effect in his declaration.  (Def. Ex. 4 ¶ 4).

Mujihad further stated to the medical examiner that Marzuq "did not use illicit drugs such as cocaine, meth or crack but he did smoke marijuana," although he "had not smoked anything throughout the day."  (Def. SMF Ex. 3, at 2).  The toxicology report from the Georgia Bureau of Investigation Division of Forensic Sciences indicates that Marzuq's blood tested positive for cannabinoids after his death.  (Compl. Ex. C, at 1).

### 3.      The Denial of the Claim for Benefits

After her husband's death, Alexandre submitted a claim for accidental death benefits. (Def. SMF Ex. 6, at 1).  On July 31, 2019, AIG Claims Inc., the claims administrator for National Union, denied the claim.  (*Id.*).  It reviewed the City of Atlanta Incident Report, the Fulton County Medical Examiner's Investigative Summary, the Georgia Death Certificate, an autopsy report, and the claims form submitted by Alexandre.  (*Id.*).  It concluded that accidental death benefits were not payable because Marzuq's death "was not a result of bodily injury sustained as a direct result of an unintended, unanticipated accident but was the result of suicide or an intentionally self-inflicted Injury."  (*Id.* at 2-3).

On September 4, 2019, Alexandre appealed that decision.  (Def. SMF Ex. 7, at 1).  Eight months later, National Union's ERISA Appeal Committee denied the appeal.  (Def. SMF Ex. 8, at 1).  In addition to the materials AIG had reviewed, the Committee considered Alexandre's

appeal letter, including Mujihad's declaration and several Eleventh Circuit ERISA decisions; the final death certificate; and case law and analysis from outside defense counsel. (*Id.*). It concluded that "Marzuq's death was caused by suicide or intentionally self-inflicted injury." (*Id.* at 3). It found "the cumulative and consistent information contained in the Atlanta Police Department report, final death certificate, and investigative summary of the Fulton County Medical Examiner . . . more credible than the singular, after-the-fact Declaration of Mujihad Muhammad . . . ." (*Id.* at 2). Because the Committee concluded that Marzuq's death was by suicide, it denied the appeal. (*Id.* at 3).

### B. **Procedural Background**

On January 21, 2020, Alexandre brought this action against National Union pursuant to § 502(a)(1)(B) of ERISA in the Southern District of Florida. The complaint alleges that National Union's denial of benefits was "de novo wrong, arbitrary and capricious, and in breach of fiduciary duties" because (1) neither AIG nor National Union conducted a "reasonable, independent investigation" into Marzuq's death; (2) the information on which AIG and National Union relied to deny Alexandre benefits "does not overcome the presumption against suicide" adopted in *Horton v. Reliance Standard Life Insurance Co.*, 141 F.3d 1038 (11th Cir. 1998) (per curiam); and (3) AIG and National Union "labored under a conflict of interest because [they] are contractually bound to pay Alexandre's claim from the assets of AIG and [National Union]." (Compl. ¶ 24 (internal quotation marks omitted)). It seeks a judgment "requiring [National Union] to fulfill its fiduciary duties to Alexandre under ERISA, the Plan and the Policy by paying to Alexandre the $500,000.00 accidental death benefit provided by the Policy" plus interest, costs, and attorneys' fees. (*Id.* ¶ 26).

On February 19, 2020, National Union moved for a change of venue pursuant to 28 U.S.C. § 1404(a). The court granted that motion, and the action was transferred to this district.

Before the action was transferred, on March 17, 2020, Alexandre moved for summary judgment. After the action was transferred, the Court held a status conference, and that motion was deemed still pending. National Union then cross-moved for summary judgment.

## II.    Legal Standard

In an ERISA benefit-denial case, summary judgment operates as "a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005). Unlike the usual summary-judgment standard, "the non-moving party is not entitled to . . . inferences in its favor." *Id.* Instead, the district court "sits more as an appellate tribunal" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

When the plan administrator has been granted such discretion, its decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion. *See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013). "Whatever label is applied, the relevant standard asks whether a plan administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" *Id.* (quoting *Leahy*, 315 F.3d at 17).

"Evidence is substantial if it is reasonably sufficient to support a conclusion." *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). A plan administrator may not "ignore contrary evidence, or engage with only that evidence which supports his conclusion." *Petrone v. Long Term Disability Income Plan*, 935 F. Supp. 2d 278, 293 (D. Mass. 2013) (citing

*Winkler v. Metropolitan Life Ins. Co.*, 170 Fed. App'x. 167, 168 (2d Cir. 2006); *Love v. National City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009)).  But "the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."  *Gannon*, 360 F.3d at 213.

**III.    Analysis**

The Court must first determine whether the plan provides defendant discretionary authority to determine eligibility for benefits such that its decisions are entitled to deference.  *See Firestone Tire & Rubber Co.*, 489 U.S. at 115.  That authority "must be expressly provided for." *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue Inc.*, 813 F.3d 420, 427 (1st Cir. 2016) (citing *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir. 1993)).  Even though the plan is not required to contain any "precise words," it must offer "more than subtle inferences" to secure discretionary review.  *Gross v. Sun Life Assurance Co.*, 734 F.3d 1, 15-16 (1st Cir. 2013); *see also Stephanie C.*, 813 F.3d at 428 ("[A] grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that unambiguously indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances." (emphasis omitted)).  The inquiry is ultimately one of notice:  "[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case."  *Stephanie C.*, 813 F.3d at 427 (quoting *Gross*, 734 F.3d at 14).

Here, the plan expressly provides defendant discretionary authority to determine eligibility for benefits and to construe its terms:  "The Plan Administrator has assigned fiduciary responsibility for claims determination to [National Union].  [National Union] has the right to interpret the provisions of this Plan, and its decisions are conclusive and binding."  (Def. SMF

Ex. 1, at 17).  That grant of discretionary authority is "sufficiently clear" to give notice to plan

participants that such authority has been provided.  *See Stephanie C.*, 813 F.3d at 427.  The Court

will therefore review defendant's decision for abuse of discretion.  *See Colby*, 705 F.3d at 61.

As noted, the policy provides that defendant will pay death benefits if the death occurs as

the result of a "bodily injury . . . which is sustained as a direct result of an unintended,

unanticipated accident that is external to the body . . . ."  (Def. SMF Ex. 2, at 34).  The policy

also contains a suicide exclusion.  (*Id.*).

The term "accident" is not defined in the plan documents.  In *Wickman v. Northwestern

National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990), the First Circuit established a framework

to interpret the term "accident" in AD&D insurance policies.  Courts first consider the

expectations of the insured at the time of the incident that caused his death.  *See id.* at 1088.[3]  If

the insured expected the injury, then his actual expectations make his death not accidental and

thus not covered by the policy.  If the insured did not expect an injury similar in type or kind to

that suffered, courts then ask whether the insured's expectations were reasonable.  *See id.*  If the

insured's expectations were not reasonable, then his death is again not covered by the policy.  In

other words, for an insured's death to be covered, "the beneficiary must demonstrate that the

insured did not expect an injury similar in type or kind and that the suppositions underlying this

expectation were reasonable."  *Wightman v. Securian Life Ins. Co.*, 453 F. Supp. 3d 460, 467 (D.

---

[3] When the First Circuit initially articulated the *Wickman* framework, it identified the relevant timeframe
during which to consider the insured's expectations as when the AD&D policy was purchased.  *See Wickman*, 908
F.2d at 1088 ("[T]he reasonable expectations of the insured when the policy was purchased is the proper starting
point for a determination of whether an injury was accidental under its terms.").  The court has since clarified that
the inquiry properly focuses on "the expectations of the insured at the time of the incident that caused his death."
*See Stamp v. Metropolitan Life Ins. Co.*, 531 F.3d 84, 88-89 (1st Cir. 2008); *see also id.* at 88 ("[A]side from the
reference to the expectations at the time of purchase as a 'starting point,' the analysis in *Wickman* makes no further
reference to those expectations and is instead concerned solely with the insured's expectations related to the
intentional conduct that caused his death.  We adopt that approach as well.").

Mass. 2020).

If the insured's expectations are unknowable, courts instead conduct "an objective analysis of the insured's expectations." *Wickman*, 908 F.2d at 1088. That analysis considers "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* If a reasonable person with similar characteristics to the insured would have viewed the injury causing his death as highly likely to occur, then his death is not covered.

In a typical *Wickman* case, the insured's conduct is undisputed, and the only question is whether the insured expected or should have expected that the conduct would result in his death. For example, when an insured drinks and drives and dies in an ensuing accident, courts apply the *Wickman* framework to determine whether the insured expected or should have expected that his drinking and driving would result in death such that the death would not be considered an "accident" under the relevant policy. *See, e.g.*, *Stamp*, 531 F.3d at 88-91 ("In *Wickman* terms, it is not arbitrary and capricious to conclude that a reasonable person would view death or serious injury as a highly likely outcome of driving while so drunk that one may need help to stand or walk and is likely to black out."); *McGillivray v. Life Ins. Co.*, 519 F. Supp. 2d 157, 164 (D. Mass. 2007) ("[M]ost courts employ the *Wickman* test in determining whether an insured's death or injury while operating a motor vehicle under the influence of alcohol is caused by an 'accident', and the majority have concluded that those who are injured or killed as a result of operating a motor vehicle under the influence of a substantial amount of alcohol are not injured or killed by reason of an 'accident.'" (internal citation omitted)).

Here, defendant concluded that the incident occurred as described in the investigative summary rather than Mujihad's declaration. (Def. SMF Ex. 8, at 2 (describing "Marzuq's

volitional and purposeful conduct" as "sprinting out of the hotel room and hurtling himself over the 10th floor railing of a high-rise hotel")).  That conclusion cannot be considered arbitrary, capricious, or an abuse of discretion.  The investigative summary, authored by a state official in the exercise of his official duties, describes the medical examiner's investigation the morning of the incident.  That investigation included conversations with the responding police officer and two percipient witnesses, Mujihad and an individual who was in the hotel atrium at the time of Marzuq's fall.  The summary recounts the incident as Mujihad and the witness twice described it in its immediate aftermath—first to the responding officer and then to the medical examiner. Defendant found "the cumulative and consistent information contained in the Atlanta Police Department report, final death certificate, and investigative summary of the Fulton County Medical Examiner . . . more credible than the singular, after-the-fact Declaration of Mujihad Muhammad . . . ."  (Def. SMF Ex. 8, at 2).  Considering the contemporaneous and impartial nature of the investigative summary and the *Wickman* framework, the Court cannot conclude that defendant's conclusion—that Marzuq's death was not an accident—constitutes an abuse of discretion.  *See Colby*, 705 F.3d at 61 ("[T]he relevant standard asks whether a plan administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" (quoting *Leahy*, 315 F.3d at 17)).

Even if Marzuq's death were considered an accident and thus within the scope of the coverage of the policy, defendant's further conclusion that his death is expressly excluded as an intentional self-inflicted injury is likewise not arbitrary, capricious, or an abuse of discretion. That conclusion is supported by substantial evidence, including the investigative summary and the official death certificate concluding that the death was by suicide.  *See Gannon*, 360 F.3d at

213 ("Evidence is substantial if it is reasonably sufficient to support a conclusion.").  Defendant properly engaged with the contrary evidence—specifically, Mujihad's declaration—but reasonably rejected that evidence as less credible than the contemporaneous, neutral evidence from the state.  *See id.* ("[T]he existence of contrary evidence does not, in itself, make the administrator's decision arbitrary.").  The Court must therefore conclude that defendant's denial of benefits based on the specific "intentional self-inflicted injury" exclusion is also reasonable.[4]

Plaintiff nonetheless contends that the evidence is inconclusive, which requires a finding of accidental death based on the presumption against suicide.  In support of that position, she relies exclusively on the Eleventh Circuit's decision in *Horton v. Reliance Standard Life Insurance Co.*, 141 F.3d 1038 (1998) (per curiam).  In that decision, the Eleventh Circuit concluded that in ERISA death-benefits cases, "when the evidence is inconclusive as to whether the deceased died by accidental or intentional means, use of the legal presumptions against suicide and in favor of accidental death are appropriate."  *Id.* at 1040.  Plaintiff reasons that those presumptions apply here "because the evidence 'yields no conclusive answer' to the question: was [Marzuq's] death the result of an 'accident' or a 'suicide'?"  (Pl. Mem. at 7 (quoting *Horton*, 141 F.3d at 1042)).

As an initial matter, Eleventh Circuit precedents are not binding on the Court.  And that remains true here even though the case was originally filed in the Southern District of Florida.

---

[4] The complaint alleges that the denial of benefits was "de novo wrong, arbitrary and capricious and in breach of fiduciary duties" because defendant "labored under a conflict of interest."  (Compl. ¶ 24 (internal quotation marks omitted)).  Plaintiff has not made a similar contention in her motion for summary judgment.  In any event, however, the presence of a structural conflict—where the plan administrator both makes eligibility determinations and pays out benefits—does not alter the "arbitrary or capricious" standard of review.  *See Denmark*, 566 F.3d at 8.  It is instead "one factor among many that a reviewing judge must take into account."  *Metropolitan Life Ins. v. Glenn*, 554 U.S. 105, 116 (2008).  Considering the contemporaneous evidence from neutral sources supporting defendant's decision, the conflict of interest is insufficient, without more, to offer a basis for the Court to conclude that defendant's decision was arbitrary and capricious.

11

The First Circuit recently explained that after a federal-question case is transferred pursuant to § 1404(a), the transferee court should apply its own circuit's precedents concerning the meaning of federal law. *See AER Advisors, Inc. v. Fidelity Brokerage Servs., LLC*, 921 F.3d 282, 288-91 (1st Cir. 2019); *id.* at 288 ("[E]very Circuit [that has considered the issue] has concluded that when one district court transfers a case to another, the norm is that the transferee court applies its own Circuit's cases on the meaning of federal law . . . ."). As a result, the Court must follow First Circuit precedents in the present dispute. And it is not aware of, and plaintiff has not identified, any presumption against suicide in this circuit.[5]

In any event, even assuming that the Eleventh Circuit's decision is persuasive, it is still of little help to plaintiff. The presumption applies only "when the evidence is inconclusive as to whether the deceased died by accidental or intentional means." *Horton*, 141 F.3d at 1040. Here, the evidence is not inconclusive. Even though Mujihad's declaration casts some doubt on whether Marzuq's death was intentional, there is substantial evidence, including the investigative summary and death certificate, that indicates that it was. *See id.* at 1042 (explaining that the presumption against suicide is overcome when "the factfinder becomes convinced, given all the evidence, that it is more likely than not that [the insured] committed suicide"); *see also Wickman*, 908 F.2d at 1088 n.5 (noting that the presumption against suicide is "not irrebuttable, and only exist[s] to shift the burden of going forward with the evidence to the party arguing

---

[5] In *Wickman*, the First Circuit noted that the plaintiff relied extensively on a presumption against suicide, but the court did not reach the issue:

> Because the magistrate decided there was no accident in this case, and we affirm on this basis, he did not and we need not reach the question of whether Wickman's death was actually a suicide. The failure to reach this issue makes the presumption relating to the death certificate and the presumption against suicide, relied upon extensively by the plaintiff, irrelevant.

*Wickman*, 908 F.2d at 1088 n.5.

suicide").  Accordingly, even considering the presumption against suicide, defendant's denial of

benefits was not arbitrary, capricious, or an abuse of discretion.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED, and

defendant's motion for summary judgment is GRANTED.

**So Ordered.**


                                                      /s/ F. Dennis Saylor IV
                                                      F. Dennis Saylor IV
Dated:  January 20, 2021                              Chief Judge, United States District Court